# 16-1715

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

RYAN DUFORT,

*Plaintiff-Appellant,*

—against—

CITY OF NEW YORK, JOSEPH MAROTTA, JAE SHIM, THOMAS CONFORTI,
WILLIAM SCHMITTGALL, RICHARD A. BROWN, PATRICK O'CONNOR,
MICHAEL VOZZO, JOHN and JANE DOE 1 through 10,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR PLAINTIFF-APPELLANT

EDWIN G. SCHALLERT
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000

*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...............................................................1

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF ISSUES PRESENTED.............................................1

STATEMENT OF THE CASE................................................................2

    A.    The Misidentification of Mr. Dufort .....................................4

    B.    The Police's Failure to Create a Contemporaneous Record of Ms. Park's Statements ............................................6

    C.    The Indictment, Trial, and Acquittal.....................................9

    D.    Mr. Dufort's Civil Rights Claims.........................................13

STANDARD OF REVIEW ...................................................................16

SUMMARY OF ARGUMENT .............................................................17

ARGUMENT ........................................................................................19

I.    The Judgment Should Be Overturned Because the District Court Erred in Its Probable Cause Determination. ............................................19

    A.    The District Court Misapplied the Law in Determining that Ms. Park's Identification of a Maroon Sweatshirt Constituted Probable Cause. ...................................................19

    B.    The District Court Did Not Give Sufficient Weight to the Suggestive Nature of the Lineup.........................................24

    C.    The District Court Failed to Consider and Construe Inferences Regarding Exculpatory Evidence Weighing Against Probable Cause in Mr. Dufort's Favor. .............................................28

    D.    The District Court Misapplied the Law in Conflating Presence at the Scene with Likelihood of Involvement. ....................34

II.    The District Court Did Not Give Sufficient Weight to Material Factual
       Disputes Regarding the Improper Police Procedures in this Case that
       Tainted the Grand Jury and Subsequent Proceedings. ...................................36

       A.    A Triable Issue of Fact Exists Regarding Whether the Chain of
             Causation between the Officers' Conduct and the Subsequent
             Prosecution was Broken. .....................................................................36

       B.    The District Court Failed to Draw Inferences and Resolve
             Ambiguities in Mr. Dufort's Favor Regarding Whether the
             Defendant-Officers Had Probable Cause to Initiate a Criminal
             Proceeding Against Mr. Dufort. ..........................................................43

       C.    The District Court Did Not Give Sufficient Weight to Material
             Factual Disputes Regarding the Improper Police Procedures in
             this Case that Gave Rise to Claims for Deprivation of the Right
             to a Fair Trial and to Substantive Due Process. .................................45

III.   The Defendant-Officers Are Not Entitled to Qualified Immunity. ...............47

       CONCLUSION ......................................................................................................48

ii

## TABLE OF AUTHORITIES

**CASES**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).....................................................16

*Bassett v. Ferrucci*, No. 94-CV-655, 1996 WL 347207 (N.D.N.Y June 19, 1996)...........................................................................................................................21, 22

*Bermudez v. City of New York*, 790 F.3d 368 (2d Cir. 2015) ...........................39, 40, 41

*Betts v. Shearman*, 751 F.3d 78 (2d Cir. 2014) .......................................................19

*Brunson v. City of New York*, No. 07-CV-2308(CBA), slip op. (E.D.N.Y. Jan. 26, 2011) ........................................................................................................21, 22

*Bryant v. Maffucci*, 923 F.2d 979 (2d Cir. 1991) .......................................................16

*Carrow v. City of New York*, No. 06-CV-1436, 2010 WL 1009996 (S.D.N.Y. Mar. 17, 2010).............................................................................................................21

*Fabrikant v. French*, 691 F.3d 193 (2d Cir.2012) ...................................................27

*Fappiano v. City of N.Y.*, 640 Fed. App'x 115 (2d Cir. 2016) ...................................45

*Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219 (2d Cir. 1994).....................................................................................................................16, 36

*Golino v. City of New Haven*, 950 F.3d 864 (2d Cir. 1991).......................................48

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982).................................................................47

*Higazy v. Templeton*, 505 F.3d 161 (2d Cir. 2007) ...............................................36, 38

*Israel v. Odom*, 521 F.2d 1370 (7th Cir. 1975) .......................................................24

*Jaegly v. Couch*, 439 F.3d 149 (2d Cir. 2006)............................................................31

*Lennon v. Miller*, 66 F.3d 416 (2d Cir. 1995).............................................................48

*Maldonado v. City of N.Y.*, No. 11-CV-3514 RA, 2014 WL 787814 (S.D.N.Y. Feb. 26, 2014).................................................................................46, 48

*Mandell v. Cty of Suffolk*, 316 F.3d 368 (2d Cir. 2003) ...........................................47

*Martinez v. Simonetti*, 202 F.3d 625 (2d Cir. 2000)........................................18

*McDowell v. Heath*, No. 09-CV-7887, 2013 WL 2896992 (S.D.N.Y. June 13, 2013)........................................................................21

*Myers v. Cnty of Orange*, 157 F.3d 66 (2d Cir. 1998)......................................39

*Neil v. Biggers*, 409 U.S. 188 (1972) ................................................................25

*Panetta v. Crowley*, 460 F.3d 388 (2d Cir. 2006)......................................19, 27

*Raheem v. Kelly*, 257 F.3d 122 (2d Cir. 2001) ...............................23, 24, 25, 26

*Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123 (2d Cir. 1997) ..............42, 45

*Savino v. City of New York*, 331 F.3d 63 (2d Cir. 2003).........................19, 45

*Shamir v. City of New York*, 804 F.3d 553 (2d Cir. 2015).......................31, 32

*Simmons v. United States*, 390 U.S. 377 (1968)...............................................24

*Stansbury v. Wertman*, 721 F.3d 84 (2d Cir. 2013).........................................27

*Townes v. City of New York*, 176 F.3d 138 (2d Cir. 1999)..............................35

*United States v. Eltayib*, 88 F.3d 157 (2d Cir. 1996).........................23, 24, 25

*United States v. McDermott*, 918 F.2d 319 (2d Cir. 1990)...........................47

*United States v. Thai*, 29 F.3d 785 (2d Cir. 1994)........................................23

*VKK Corp. v. Nat'l Football League*, 244 F.3d 114 (2d Cir. 2001) ............16

*Weyant v. Okst*, 101 F.3d 845 (2d Cir. 1996).................................................18

*Williams v. City of New York*, No. 14-CV-7158 (JPO), 2016 WL 3194369 (June 7, 2016)......................................................................24

*Ybarra v. Illinois*, 444 U.S. 85 (1979) ...........................................................33

*Zahrey v. Coffey*, 221 F.3d 342 (2d Cir. 2000).........................................40, 46

STATUTES

28 U.S.C. § 1291 ...................................................................1, 3, 4, 5, 9

28 U.S.C. §§ 1331, 1343, and 1367 .......................................................................1

Sections 1981, 1983, and 1988 of the United States Code ...................................1, 12, 13

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(a) .............................................................................................16

Fifth Amendment ...................................................................................................38

Maria S. Zaragoza, Robert F. Belli, & Kristie E. Payment, *Misinformation Effects and the Suggestibility of Eyewitness Memory* ........................................41

## PRELIMINARY STATEMENT

Plaintiff Ryan Dufort ("Mr. Dufort") respectfully submits this brief in support of his appeal from the April 28, 2016 final judgment in favor of Defendants City of New York, Joseph Marotta, Jae Shim, Thomas Conforti, William Schmittgall, and John and Jane Doe Defendants 1-10 (collectively, "Defendants" or "the City"). In its Memorandum and Order (the "Order"), the District Court granted Defendants' motion for summary judgment in its entirety, dismissing Mr. Dufort's civil rights claims pursuant to Sections 1981, 1983, and 1988 of the United States Code, as well as certain state law claims. (A19-40.)[1]

## JURISDICTIONAL STATEMENT

The District Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1343, and 1367. This court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291. The District Court entered final judgment in this case on April 28, 2016. (A541.) Mr. Dufort timely filed a notice of appeal on May 27, 2016. (A542.)

## STATEMENT
## OF ISSUES PRESENTED

1.  Did the District Court err in granting summary judgment dismissing Mr. Dufort's claims for false arrest and malicious prosecution where (i) the

---

[1] The parties consented to the assignment of the case to a United States Magistrate Judge. Accordingly, Magistrate Judge Gold oversaw all proceedings in the district court.

only eyewitness who identified Mr. Dufort in surveillance videos made the identification solely on the basis of an article of clothing Mr. Dufort was wearing rather than any of his facial or physical characteristics, (ii) at least one other potential suspect wore similar clothing, (iii) the only eyewitness who identified Mr. Dufort in a lineup did so because the lineup was improperly suggestive due to Mr. Dufort's wearing a similar or identical article of clothing he can be seen wearing in surveillance video previously viewed by the same eyewitness, and (iv) five other eyewitnesses could not identify Mr. Dufort in the same lineup?

2. Did the District Court err in granting summary judgment dismissing Mr. Dufort's claims for malicious prosecution and denial of due process and a fair trial where issues of causation and the scope of the defendant-officers' misconduct depend on the resolution of whether the assistant district attorneys responsible for Mr. Dufort's prosecution knew (i) the limited scope of the sole eyewitness identification of Mr. Dufort and (ii) the manner by which the defendant-officers improperly constructed the same eyewitness's lineup identification?

## STATEMENT OF THE CASE

When he was a 15-year-old student at Bayside High School in Queens, Ryan Dufort accompanied a group of friends to the Pastel Karaoke bar on the night of

October 7, 2006. (A288, ¶ 1; A292, ¶¶ 24-25.)  He was the youngest person in the group.  He had no record and had never been arrested.  (A367 at 18:3-5.)  That night, he was dressed like a typical teenager, wearing a maroon zip-up sweatshirt with the letters "American Eagle" on the front, over a blue t-shirt.  (*See* A397, 'Dufort Movie' at 00:35.)  Throughout the night, Mr. Dufort periodically removed his sweatshirt and was dressed only in his t-shirt and jeans.  *Id.* at 3:12-16:25.

At Pastel Karaoke, Mr. Dufort and his friends met another group of approximately twenty individuals.  (A292, ¶ 26.)  For most of the night, they relaxed in private Karaoke rooms.  (A86; A182.)  At approximately 3:50 a.m. on October 8, 2006, a separate group at Pastel Karaoke— Hwa Young Park ("Ms. Park"), Jung Hwa Lee, Mink-ki Shin, and In Hee Yoo—started to leave.  A fight broke out, and, in a chaotic scene, a group of approximately 10-20 males assaulted Lee and Shin.  (A289, ¶ 7.)  Shin was seriously injured, and Lee subsequently died after being taken to Flushing Hospital in Queens.  (A288-89, ¶¶ 3-4.)

When the fight broke out, Mr. Dufort was still in one of the private rooms.  (A86-87; *see also* A373-74 at 51:22-52:2.)  A friend came in and told the group that a fight had broken out.  *Id.*  Mr. Dufort grabbed his sweatshirt and ran out of the bar, passing through the scene of the fight.  (A86-87.)  He did not participate in the fight.  *Id.*; (A468, ¶ 5.)

## A.     The Misidentification of Mr. Dufort

Ms. Park, an acquaintance of Lee and Shim, witnessed some but not all of the fight; at one point she left the scene to call for help.  (A112 at 56:4-14.)  She accompanied Lee and Shin to Flushing Hospital and was interviewed by police there at approximately 5:30 a.m. that same morning.  (A289, ¶ 5.)  Ms. Park then accompanied police to the 109th Precinct where defendant Detective Joseph Marotta showed her surveillance video and still images from Pastel Karaoke from earlier that morning.  Pastel Karaoke had several surveillance cameras but none captured the location of the fight, or the fight itself.  (A526.)  Instead, the video captured a street entrance to the bar, an interior hallway leading to karaoke rooms, and part of the bar area.  *Id.*  Mr. Dufort appears in the surveillance footage, sometimes wearing the maroon sweatshirt, but at other times wearing only his blue t-shirt.  (A397, 'Dufort Movie' at 1:20-1:45; 2:45-16:24.)

While viewing the surveillance video and still images, Ms. Park told Detectives Marotta and Shim that she had seen one of the assailants wearing a shirt or jacket that appeared to be the same "reddish" color of the sweatshirt Mr. Dufort can be seen wearing in the surveillance footage.[2]   (A446 at 152:6-24.) Specifically, she told the police that Mr. Dufort's sweatshirt was the same color as

---

[2]    Ms. Park speaks limited English and was assisted by a Korean translator during her deposition taken in this case.  (A158 at 143:2-3.)  She also spoke to the police in both English and Korean through Detective Jae Shim.  (A442-43 at 114:25-115:18.)

the *back* of a shirt that one of the assailants was wearing. (A329, ¶ 13.) Thus, although she viewed hours of surveillance footage, paused intermittently by the detectives to focus her attention on certain individuals, (A114-15 at 76:12-77:7), Ms. Park told the police that she did not and could not identify a single facial or other physical characteristic of Mr. Dufort. Instead, as she explained to the police, she recognized only the *color* of the sweatshirt, not the individual wearing it or, indeed, any other identifying features of the article of clothing. (A329, ¶ 13.)

Two other individuals who knew Mr. Dufort personally, David Han and Eric Kim, also were brought in for questioning, viewed the surveillance footage, and placed Mr. Dufort as one of the individuals who appeared on the videos, wearing a maroon zip-up sweatshirt. (A292, ¶ 28.) Han was also present at Pastel Karaoke but did not identify Mr. Dufort as a participant in the assault, a fact Defendant Marotta admitted during a subsequent *Wade* hearing. (A148 at 54:6-15.) After the identification made by Han and Kim, police brought Mr. Dufort in for questioning on October 11, 2006. (A368-69 at 19:19-20:8; A86.) He told defendants Marotta and Detective William Schmittgall that although he was present at Pastel Karaoke, he did not participate in the fight. (A86-87.)

The next day, with a lawyer present, Mr. Dufort was put in a lineup. (A528.) Had the police found Ms. Park's earlier identification of Mr. Dufort through the surveillance video to be reliable, they presumably would have charged

him on that identification alone—but they did not.  Instead, despite the fact that

Defendants knew Ms. Park could not identify Mr. Dufort by his face or physical

characteristics, they nonetheless arranged for her to participate in the lineup of Mr.

Dufort.  (A294, ¶¶ 36, 38; A329, ¶ 13; A332, ¶ 36.)  During the lineup, Mr. Dufort

was wearing an identical or similar maroon sweatshirt to the one he had worn at

Pastel Karaoke, which Ms. Park had viewed in the surveillance footage, and was

the *only* person in the lineup wearing a maroon top.  (A294, ¶ 37; A332, ¶ 36;

A171 at 164:5-25 (confirming that the sweatshirt in the lineup was similar to the

one she viewed Mr. Dufort wearing in the still photos); A471.)  Ms. Park and *five*

*other eyewitnesses* were asked to identify the participant in the assault.  (A399, ¶ 8;

A469, ¶ 7.)  The other five eyewitnesses could not identify Mr. Dufort as involved

in the fight.  (A462-67; A468-69, ¶¶ 6-9.)  Only Ms. Park made a positive

identification, again based on the color of Mr. Dufort's shirt.  *Id.*

**B.    The Police's Failure to Create a Contemporaneous Record of Ms.
         Park's Statements**

This Court does not have the benefit of a contemporaneous record of Ms.

Park's statements to the detectives because Defendants Marotta and Jae Shim

failed to properly memorialize the statements that Ms. Park made to them during or

after her initial review of the surveillance footage.  (A402, ¶ 27.)  Police typically

document these statements during the course of an investigation in a "Complaint –

Follow Up Informational Report," more commonly referred to as a "DD5."  They

do so as part of standard police practice with the express purpose of memorializing witness statements. *Id*., ¶ 28. In a homicide investigation of this nature, the absence of a DD5 documenting Ms. Park's statements regarding her review of the videos and still photos is "highly unusual." *Id*., ¶ 29. Because of the police's failure to make such a record in this case, the only statements by Ms. Park concerning her purported identification were given four months after the incident (her grand jury testimony), almost five years after the incident (her trial testimony), and more than seven years after the incident (her deposition testimony). None of these statements reflects a reliable identification of Mr. Dufort, and in fact, at trial, Ms. Park could not identify Mr. Dufort in the courtroom.

The most extensive information regarding her identification of the maroon shirt and her subsequent statements made at the time of the lineup comes from her deposition testimony, in which she stated the following:

> Q. Did you know any faces? When this incident ended, let's say it was 4:15 in the morning, if I spoke to you at 4:16, did you know any faces of anyone who did kicking and stomping? . . .
>
> A. Not by the faces.

A434 at 77:16-20, 23.

> Q. When you went through the video and you saw this particular image, that is Plaintiff's Exhibit 2, did you tell them that you knew the color or the shirt but not the face? . . .
>
> A. Yes.

A444 at 150:5-9, 12.

Q. Do you remember if that influenced your selection of Ryan in the line up that he was wearing the same or similar shirt that he was wearing in the video that you saw on October 8th?

A. Both.

Q. Both what?

A. Both, I was able to pick Ryan Dufort through the line up is because I saw, I reviewed the videos, of course, and also by I remember the color of his clothing.

A451 at 165:2-13. Such testimony makes clear that Park's "identification" of Mr. Dufort was extremely limited: she first identified only the color of a piece of clothing, and later picked Mr. Dufort out of a lineup based on the same color clothing.

Moreover, Ms. Park also stated at her deposition that she remembered "about two" people wearing maroon shirts. (A436 at 96:4-9.) Regarding these individuals, she stated:

Q. What do you remember about the approximately two shirts of that [reddish] color? Can you describe them? Two separate individuals, right?

A. Two separate individuals, but I don't know which person I saw exactly. But one who were wearing those kind of color was [j]umping and stomping Jung Hwa Lee.

Q. What about the other one of the two, was that one doing anything or was it one of the two in the red shirt?

A. I don't know who is who. But maybe the both. I don't remember exactly.

A436-37 at 96:17-97:7.

The surveillance video supports her statements: there are multiple individuals wearing maroon on the night of the assault, one of whom the surveillance video clearly shows was present during the assault and at one point was directly in Ms. Park's sightline. (*See* A501, 'Hallway entrance' at 150:01-150:09; A501, 'Front desk of bar (2:00am-4:45am)' at 136:48-136:51; A501, 'Front outside entrance view of karaoke bar (3:47am-4:22am)' at 2:41-2:44; *Cf.* A397, 'Dufort Movie' at 17:06-17:13 (comparable view of Mr. Dufort's clothing to other maroon-wearing male in A501, 'Hallway entrance' at 150:01-150:09); *see also* A501, 'Hallway entrance' at 23:25-23:31, 24:13-24:23; 43:26-43:37; 126:42-126:48 (other individuals wearing maroon).) The presence of these other individuals—and Ms. Park's failure to distinguish between them because she could only identify the color of their clothing—increases the unreliability of her identification.

### C.     The Indictment, Trial, and Acquittal

After the lineup, Mr. Dufort was held for another night in the precinct. (A212.) It was not until October 13, 2006, the day after Ms. Park identified Mr. Dufort in the lineup, that defendant Marotta swore to a criminal complaint against Mr. Dufort, charging him with murder in the second degree (N.Y. Penal L. §§ 125.25-1, 125.25-2) and manslaughter in the first degree (N.Y. Penal L. § 125.20-1), gang assault in the first degree (N.Y. Penal L. § 120.07), and assault in

the second degree (N.Y. Penal L. § 120.05-1).  (A472-73.)  Nine others were also

charged with murdering Lee and assaulting Shin.[3]  (A295, ¶ 40; *see also* A528-29.)

Mr. Dufort admitted that he was present at Pastel Karaoke bar on the night

of the incident but has always maintained that he was not involved in the fight in

any way: he was in the wrong place at the wrong time and too young to know any

better.  Nonetheless, Mr. Dufort was denied bail and was held in pre-trial detention

from the age of 15 to 20 on the basis of Ms. Park's faulty eyewitness identification.

Over a three-day period in early 2007, four months after his arrest, ADAs

Michael Vozzo and Andrea Eckhardt presented evidence to a grand jury seeking an

---

[3]    Jonathan Putt cooperated with the government to provide testimony in exchange for a guilty
plea to assault in the first degree and attempted gang assault with a two year sentence.
(A295, ¶¶ 42-43.)  Putt testified at the grand jury that Mr. Dufort was present during the
assault and that he had a pipe on the night in question, but he did not say that Mr. Dufort
participated in the assault.  *Id.*; (A333 ¶ 43(e).)  Sebastian Yoon pled guilty to manslaughter
in the first degree and accepted a sentence of fifteen years.  (A297, ¶ 46)  Yoon said with
respect to Mr. Dufort, "I think he punched."  (A333-34, ¶ 47) (*See supra* II.B. for a
discussion and the context of Yoon's statement)  Jeffrey Shih pled guilty to assault in the
second degree (N.Y. Penal L. § 120.05 00 DF).  (A259.)  Alex "Woo" Kim pled guilty to
gang assault in the second degree (N.Y. Penal L. § 120.06 00 CF).  (A256.)  Of those
defendants who proceeded to trial, all but Mr. Dufort were convicted.  John Bae was
convicted of gang assault in the second degree (N.Y. Penal L. § 120.06 00 CF).  (A252.)
Christopher Baez was convicted of gang assault in the first degree (N.Y. Penal L. § 120.07
00 BF) and gang assault in the second degree (N.Y. Penal L. § 120.06 00 CF).  (A253.)
Aram Choi was convicted of gang assault in the first degree (N.Y. Penal L. § 120.07 00 BF)
and gang assault in the second degree (N.Y. Penal L. § 120.06 00 CF).  (A254.)  Il Park was
convicted of gang assault in the first degree (N.Y. Penal L. § 120.07 00 BF), manslaughter
in the first degree (N.Y. Penal L. § 125.20 01 BF), and gang assault in the second degree
(N.Y. Penal L. § 120.06.00 CF).  (A257-58.)  Detective Marotta testified that Samuel Song
committed murder in the second degree (N.Y. Penal L. § 125.25-1), attempted murder in the
second degree (N.Y. Penal L. §§ 110/125.25-1), gang assault in the first degree (N.Y. Penal
L. § 120.07) (2 counts), manslaughter in the first degree (N.Y. Penal L. § 125.20-1), and
gang assault in the second degree (N.Y. Penal L. § 120.06) (2 counts).  (A233).  However, it
is unclear from the record what happened with the disposition of Samuel Song's case and
whether he cooperated.

indictment against Mr. Dufort and six other individuals. (A295, ¶ 41.) Ms. Park's testimony was the only evidence presented to the grand jury that directly identified Mr. Dufort as one of the assailants.[4] Critically, the grand jury was not informed that Ms. Park had identified only a maroon sweatshirt, and not Mr. Dufort himself. (*See* A478-79 at 72:21-73:22 (Detective Marotta testifying about the lineup, but not about the limited nature of Park's identification); A494-96 at 63:10-65:21 (Park stating that she identified several individuals in lineups, but failing to state that she could only identify Mr. Dufort by his clothing).) Based on Ms. Park's purported identification of Mr. Dufort, the grand jury indicted Mr. Dufort on February 23, 2007. (A529.)

On November 28, 2007—approximately fourteen months after Mr. Dufort was first arrested—one of Mr. Dufort's co-defendants, Sebastian Yoon, pled guilty to manslaughter and implicated his co-defendants as part of that plea. (*See generally* A415-23.) During his plea allocution, the trial judge allowed the ADA to ask Yoon questions. Specifically, Yoon was asked the following questions and gave the following answers:

---

[4] The only other evidence presented to the grand jury related to Mr. Dufort was testimony from Jonathan Putt, who had an agreement with the government to provide truthful testimony in exchange for a plea, and who testified that after leaving the fight, Mr. Dufort had agreed with another defendant's statement that the pipe the other defendant had used was "good" because it "didn't bend." (A500 at 53:4-13; A295, ¶ 42.) Notably, Putt did not testify that Mr. Dufort participated in the fight, and in fact testified that he did not know where Mr. Dufort was during the fight. (A333, ¶ 43(e).)

ADA Eckhardt: Who did you go to the construction area with to pick up the weapons?

Yoon: I don't remember.

ADA Eckhardt: No way. No way.

The Court: Mr. Yoon. Let me tell you something. You are, what, 17 years old?

Yoon: Yes.

The Court: You might think you are acting macho but you won't be feeling that way if you get 25 years to life on this case.

ADA Eckhardt: Up to 50 years to life, Judge. There are two victims.

Defense counsel: And I might add, all of these other people have already confessed against you.[5]

ADA Eckhardt: Mr. Yoon, I am going to ask you again and just please be aware that if you do not answer my questions the People are going to oppose this plea.

. . . .

ADA Eckhardt: Let me ask you this. When you were there when this all broke out, what did you see [a co-defendant] do to the man who died and to the other victims?

Yoon: I don't remember. I didn't see.

The Court: Bye bye. Bring him back. Mr. Yoon you are going to trial. You face 50 years to life.

(Pause in the proceedings.)

The Court: Back on the record. You had some questions, Ms. Eckhardt?

---

[5]   The truthfulness of defense counsel's statement is not clear from the record before this Court. Mr. Dufort did not "confess" at any point.

. . .

ADA Eckhardt:  What about Ryan Dufort, what did Ryan Dufort do?

Yoon:  I think he punched.

(A248-49 at 9:14-10:6; A416 at 11:14-20, 23-24; A250 at 15:23-25.)  Thus, more than a year after the incident, facing "up to 50 years to life," a 17-year-old cooperator, under intense pressure to provide incriminating evidence against his co-defendants, could muster only the weak assertion that he "thought" Mr. Dufort "punched" during the fight.  *Id.*

When the case finally went to trial in May 2011, Ms. Park testified, but was unable to identify Mr. Dufort in the courtroom.  (A105-07 at 46:13-48:12; A530.)  She further testified that she could not recognize Mr. Dufort in the surveillance video, but instead recognized only his clothing.  (A298, ¶¶ 57-61.)  In June 2011, Mr. Dufort was promptly acquitted.  (A255.)  Of the six defendants who proceeded to trial, Mr. Dufort was the only one to be acquitted of all charges.  (A255.)

### D.    Mr. Dufort's Civil Rights Claims

Mr. Dufort commenced this civil rights action on May 8, 2012, bringing claims for violations of his civil rights pursuant to Sections 1981, 1983, and 1988 of the United States Code, as well as certain state law claims.   (A19-40.)  Mr. Dufort seeks damages for false arrest, malicious prosecution, and denial of due process and his right to a fair trial.  These claims arise from Mr. Dufort's arrest at

age 15, his subsequent five-year pretrial detention at Riker's Island, and his jury trial and ultimate acquittal. *Id.*

On April 10, 2015—after only limited discovery had been completed—Defendants filed a motion seeking summary judgment. (A81.) The District Court granted the City's motion for summary judgment after determining that Mr. Dufort's arrest and five-year pretrial detention was supported by probable cause. In so finding, the District Court denied a jury the opportunity to consider the genuine issues of material fact prevalent throughout the record. Namely:

- Whether Ms. Park identified Mr. Dufort in the surveillance video as having been involved in the assault, or whether she was only able to identify the *back of one assailant* wearing a reddish-colored shirt participating in the assault. (*Cf.* A290, ¶ 13 ("Park identified several individuals who appeared in the surveillance video as having been involved in the assault, including Ryan Dufort."); *id.*, ¶ 14 ("Park told Detective Marotta that she observed Dufort stomping on both victims.").)

- Whether Ms. Park could distinguish between the two people she identified as wearing maroon shirts at the time of the assault, or whether she instead was unable to identify which of the two actually participated in the assault. (*Cf.* A291, ¶ 22 ("Park knew there were two people wearing red-colored tops at the bar—Dufort and an individual with very short, spiky hair—and she

did not confuse Dufort with that individual when she identified Dufort as having stomped on both victims.").)

- Whether or not Ms. Park informed the ADA during the line-up that she recognized Mr. Dufort by his clothing, and not any facial or other physical characteristic. (*Cf.* A295, ¶ 39 ("Park told the five-to-six people in the viewing room during Dufort's lineup, including the ADA present [and Mackey], that she recognized Dufort by his clothing as opposed to his face.").)

- Whether or not (and if so, when) Ms. Park informed the ADA in advance of the grand jury indictment and trial that she recognized Mr. Dufort by his clothing, and not any facial or other physical characteristic. (*Cf.* A298, ¶ 55 ("During a meeting to prepare for trial, Park told ADA O'Connor that she recognized Dufort by his clothing as opposed to his face.") (A167 at 155:21-156:19; 176:3-20).)

- Whether or not the ADA knew that police inappropriately constructed Ms. Park's identification of Mr. Dufort in the lineup by having her participate in that lineup even though she had told police that she could only identify the color of an item of clothing, and Mr. Dufort was wearing that color at the time of this lineup.

The District Court also improperly ignored exculpatory evidence and drew inferences and ambiguities against Mr. Dufort, the non-moving party; for example:

- Five other eyewitnesses to the assault could not identify Mr. Dufort.

- Another individual wearing a reddish-colored shirt and carrying a bat or club is visible in the surveillance videos and can be seen hurrying towards and running away from the fight.

- Several other people wearing reddish colored tops can be seen in the Pastel Karaoke surveillance footage.

- Mr. Dufort admitted that he was at Pastel Karaoke but consistently maintained he did not participate in the assault.

## STANDARD OF REVIEW

"On appeal from a grant of summary judgment we review the record *de novo* to determine whether there are genuine issues of material fact requiring a trial." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citation omitted). The reviewing court shall assess "the district court's grant of summary judgment *de novo*, construing the evidence in the light most favorable to the non-moving party." *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 118 (2d Cir. 2001) (citation omitted).

A district court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party must prove that no such genuine dispute exists "by showing that little or no evidence may be found in support of the nonmoving party's case." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223-24 (2d Cir. 1994). Importantly, "all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought." *Id.* at 1223.

## SUMMARY OF ARGUMENT

The District Court's disposition of Mr. Dufort's civil rights claims of false arrest, malicious prosecution, deprivation of substantive due process, and violation of his right to a fair trial on summary judgment was improper on this record, which is replete with genuine disputes of material facts and numerous instances where ambiguities and inferences were drawn *against* the non-moving party.

Notwithstanding the police's construction of a suggestive and tainted lineup, and reliance upon the resulting identification, the District Court declined entirely to address the lineup. The District Court reasoned that the lineup was of no consequence because the eyewitness had previously identified Mr. Dufort by

nothing more than the color of his clothes, even though there was at least one other person on the night in question wearing the very same color who this witness could not sufficiently differentiate from Mr. Dufort. As an initial matter, the District Court erred in holding as a matter of law that the color of a shirt—standing alone— can constitute probable cause. Moreover, because the witness told the police in no uncertain terms that she could not identify the faces or physical characteristics of Mr. Dufort (who she observed only from the back), and because the surveillance footage proves only that Mr. Dufort was at the scene of the incident and that he sporadically wore a maroon sweatshirt during the time he was there, a genuine fact that was and remains in dispute (among others) is the reliability of the witness identification placing Mr. Dufort *as a participant* in the assault. In thus making this probable cause determination, the District Court failed to consider several material disputed facts and drew inferences regarding certain facts *against* the non-moving party, Mr. Dufort, in contravention of the law.

The District Court further held that because it had determined that probable cause existed to arrest Mr. Dufort, probable cause also existed to commence criminal proceedings against him (and incarcerate him for almost five years). Finally, the District Court held that there was no evidence that the officers had misrepresented or falsified evidence. Again, in each of its findings, the District Court failed to consider disputed material facts and to draw all reasonable

inferences in a light most favorable to Mr. Dufort. This Court should allow Mr. Dufort's civil rights claims to be heard by a jury.

## ARGUMENT

**I. The Judgment Should Be Overturned Because the District Court Erred in Its Probable Cause Determination.**

### A. The District Court Misapplied the Law in Determining that Ms. Park's Identification of a Maroon Sweatshirt Constituted Probable Cause.

Probable cause exists to arrest an individual when an officer has "'knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.'" *Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir. 2003) (quoting *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000)). The District Court correctly acknowledged that a determination regarding the existence of probable cause can only be made at the summary judgment phase "if there is no dispute as to the pertinent events and the knowledge of the officers." (A533) (citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)).

The District Court misapplied this standard. Like the defendants in this case, it relied on one fact in determining that probable cause existed to arrest Mr. Dufort, detain him for almost five years, and ultimately prosecute him:

Ms. Park's misidentification based solely on the color of Mr. Dufort's shirt.[6] (A533) ("Dufort's arrest was supported by probable cause because an eyewitness, Park, identified him, by his clothing, as someone she saw stomping on victims Lee and Shin."). This finding is flawed on both the facts and the law.

First, an eyewitness identification may not be used to establish probable cause when "the circumstances raise doubt as to the person's veracity." *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014) (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)). "The reliability or veracity of the informant and the basis for the informant's knowledge are two important factors." *Id.*

Ms. Park's identification lacked both of these factors. As to her basis of knowledge, she did not identify Mr. Dufort himself: at each stage of the investigation of Mr. Dufort and resulting litigation, she made clear that she could identify only the color of the top he was wearing. As to the reliability of her identification, she first identified the color of Mr. Dufort's shirt after an exhausting and traumatic night—and only after several reviews, overseen by police officers, of videotapes and still shots of Pastel Karaoke, not the incident itself. After hours of viewing surveillance footage, she could not make an identification of Mr. Dufort based on his facial or other physical characteristics. (A114-15 at 76:10-77:20;

---

[6] Indeed, the City concedes the materiality of Ms. Park's identification. (*See* A505) ("Plaintiff argues that Park did not 'identify' Dufort from the surveillance video—a fact which is central to this case.").

A117-18 at 79:7-80:2.) Her later identification of Mr. Dufort in a lineup was similarly tainted; Mr. Dufort was the *only* person who wore a maroon- or red-colored sweatshirt. (A471; A295, ¶ 39.) The other five eye witnesses who viewed the lineup could not identify Mr. Dufort. (A469, ¶¶ 8, 10.)

Second, the District Court made an improper finding of fact when it concluded that "an eyewitness, Park, identified [Mr. Dufort], by his clothing, as someone she saw stomping on victims Lee and Shin." (A533.) Ms. Park made no such identification. She saw *two* individuals wearing "reddish" colored tops (shirts or jackets) and only one was stomping on victims Lee and Shin, an identification she made only from viewing this person's back. (A434 at 77:16-23; A435-37 at 95:23-97:7; A446 at 152:13-24; A174 at 170:6-11; A177 at 176:3-12; A179 at 178:23-25.) And, while watching surveillance video, she told police that she recognized the color of Mr. Dufort's shirt. (A444 at 150:5-12) ("did you tell them that you knew the color [of] [sic] the shirt but not the face?" "Yes"). The District Court, like the police, made an improper inferential leap when it determined that Mr. Dufort, because he wore maroon that night, must have been the individual Ms. Park observed stomping and jumping on the victims.

The District Court cited only one case in support of the novel theory that the identification of the color of nondescript clothing, which was worn by at least one other person *present for the same assault*, can give rise to probable cause sufficient

to detain and prosecute a person. (A534) ("Probable cause does not require that a witness or victim recognize a perpetrator's facial characteristics; at least one court has held that an identification was sufficient to establish probable cause even though it was made by a victim who reported that he could not see the perpetrator's face because it was covered by a hood.") (citing *Brunson v. City of New York*, No. 07-CV-2308(CBA), slip op. at 2, 13 (E.D.N.Y. Jan. 26, 2011)). Other cases in which clothing is used to establish probable cause rely at least in part on *physical* descriptions in addition to clothing. *See, e.g.*, *Carrow v. City of New York*, No. 06-CV-1436, 2010 WL 1009996, at *7 (S.D.N.Y. Mar. 17, 2010) (finding that although the plaintiff was wearing a hat partially obscuring a view of the plaintiff's face, the eyewitness could nonetheless identify the plaintiff "based upon his build, the clothing he was wearing, and facial features such as his nose and jaw that could not have been obscured by a hat"); *McDowell v. Heath*, No. 09-CV-7887, 2013 WL 2896992, at *32-33 (S.D.N.Y. June 13, 2013) (upholding a determination of probable cause based on the victims' description of the perpetrator "as a black male, about 5'8" tall, weighing about 170 pounds, and wearing a white baseball cap, beige slacks, and an untucked checkered beige shirt"); *Bassett v. Ferrucci*, No. 94-CV-655, 1996 WL 347207, at *3 (N.D.N.Y June 19, 1996) ("Since [the officer] had received the description which described the suspect as wearing a green hat, a

light blue jacket, dark jeans, and as being big, [the officer] was justified in detaining [the plaintiff].").

Moreover, the case upon which the District Court relied, *Brunson*, presents a set of facts vastly different than those in this case. Although the complaining witness in that case initially told police that he did not see the plaintiff's face because it was covered by a hood, he later identified the plaintiff in a six-person photo array. *See Brunson*, No. 07-CV-2308, at 13 ("The apparent suggestions by the complaining witness, memorialized in Detective Collins's DD5s, that he believed he could not identify the perpetrators do not negate the fact that when actually presented with a photo-array, the complaining witness did make such an identification. The earlier misgivings of the witness do not fatally undermine the subsequent positive identification."). In this case, there was <u>never</u> any subsequent positive identification of Mr. Dufort based on Ms. Park's memory of the night in question. At all times, Ms. Park stated that she could only identify the color of the shirt. The *Brunson* court in fact acknowledged that the precedent it was relying on involved only identifications "where the alleged perpetrator had his face partially covered," *id.* at 13, not where the identification involved <u>no</u> facial or other physical recognition, as was the case here.

In addition, the incident in *Brunson* observed by the eyewitness involved only two suspects, a scene vastly different than the chaotic fight involving 10-20

individuals in a dark bar observed by Ms. Park. (A440 at 103:13-23.) Indeed, the Defendants admit that it was a "deadly and chaotic attack." (*See* A63.)

### B. The District Court Did Not Give Sufficient Weight to the Suggestive Nature of the Lineup.

The District Court further erred in failing to give any weight to the suggestive and misleading lineup conducted by the defendant-officers in this case, improperly concluding that "[w]hether the lineup was suggestive or not . . . is of little moment, because Park had already identified Dufort from the surveillance video before selecting him from the participants in the lineup." (A534.) However, the police plainly did not think Ms. Park "had already identified Dufort from the surveillance video," or they would have had no reason to construct a suggestive lineup to solidify their manufacture of probable cause. Accordingly, the lineup was germane to the question of whether probable cause existed, and the District Court erred by failing to adequately address the suggestive nature of the lineup.

"A photo array[7] is improperly suggestive if the picture of an accused, matching descriptions given by the witness, *so stood out from all of the other photographs* as to suggest to an identifying witness that that person was more likely to be the culprit." *United States v. Eltayib*, 88 F.3d 157, 166 (2d Cir. 1996)

---

[7] Courts examine photo arrays and lineups using the same standard. *See, e.g.*, *United States v. Thai*, 29 F.3d 785, 807-08 (2d Cir. 1994) (noting a defendant's right not to be the object of suggestive police identification procedures, such as pretrial and in-court identifications, as well as photographic arrays).

(emphasis added) (internal quotations omitted); *see also Raheem v. Kelly*, 257 F.3d 122, 134 (2d Cir. 2001) ("Lineups in which suspects are the only participants wearing distinctive clothing or otherwise matching important elements of the description provided by the victim have been severely criticized as substantially increasing the dangers of misidentification.") (quoting *Israel v. Odom*, 521 F.2d 1370, 1374 (7th Cir. 1975)) (collecting cases).

The facts of *Eltayib* are similar to those in this case. The witness in that case described the perpetrator as having "a head full of hair, real bushy hair, afro-type hair." *Id.* at 166. The witness was unable to describe "any features of the man's face." *Id.* In holding that the subsequent lineup, in which the defendant's hairline was the only one that was not cropped short, was unduly suggestive, the court stated:

> One would think that if a suspect is described only in terms of one characteristic, the filler photos in an array would also portray people having that characteristic. Otherwise, there may be no real identification, just a witness with the wit to suppose that the one suspect with the salient characteristic must be the person suspected by the authorities.

*Id.* (citing *Simmons v. United States*, 390 U.S. 377, 383 (1968)); *cf. Williams v. City of New York*, No. 14-CV-7158 (JPO), 2016 WL 3194369, at *5 (June 7, 2016) (declining to find photo array improperly suggestive that consisted of "six photographs of black men, all of whom appear[ed] to be of a similar age range,

many of whom share a similar skin tone and build, and two of whom appear to keep their hair in braids"). Similarly, in *Raheem*, this Court found that witness' selection of the plaintiff in a lineup, "in which only [the plaintiff] appeared in a black leather coat, [and where the witnesses had] repeatedly mentioned the impact of the coat," resulted in a suggestive lineup. *Raheem*, 257 F.3d at 136.

The identification in this case was clearly suggestive and improper and cannot form the basis for probable cause. Ms. Park's only salient description of the assailant was that he wore a maroon piece of clothing. Mr. Dufort was the only person in the lineup wearing a maroon piece of clothing. (A471.) Defendant Marotta even acknowledged that when he conducts lineups, he sometimes puts everyone in the "same color shirt" to ensure that "nobody makes an identification based on clothing description and so forth." (A391 at 643:1-16.) But in this case, Defendant Marotta did not instruct Mr. Dufort to remove his sweatshirt or give the other individuals in the lineup maroon shirts to wear, despite the fact the he *knew* Ms. Park could identify only the color of an article of clothing. (A329, ¶ 13; A332, ¶ 36.)

Even if a lineup is improperly suggestive, it may be admissible "if the identification has independent reliability," that is, if "under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Eltayib*, 88 F.3d at 167 (quoting *Neil v. Biggers*, 409

26

U.S. 188, 199 (1972); *see also Raheem*, 257 F.3d at 133 ("[T]he identification evidence will be admissible if (a) the procedures were not suggestive or (b) the identification has independent reliability."). In so determining, courts consider "(1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation." *Raheem*, 257 F.3d at 135 (internal quotations omitted).

Here, Ms. Park stated from the beginning that she could only identify a maroon shirt—not any facial or physical characteristics. *See Raheem*, 257 F.3d at 139 (finding that the witness' identifications were not otherwise reliable "given their lack of recollection as to any physical features of the shooter's face (except, as to [one witness], its roundness")). Ms. Park also made the identification in the midst of a highly chaotic scene in which at least 10-20 people were involved, and in which Ms. Park was not just observing, but was understandably trying to prevent any further harm to her friends.[8] (A289, ¶ 7; A292, ¶ 26; A100-01 at 41:13-42:8; A440 at 103:13-23; *see* A501, 'Front desk of bar (2:00am-4:45am)' at 134:00-138:00.) Although her ability to identify maroon clothing may have been sound,

---

[8] In fact, Ms. Park was so disoriented and overwhelmed that she could not even tell whether it was ten or twenty people that pushed her friend to the ground. (A101 at 42:21-24.)

there are no facts whatsoever supporting her ability to identify Mr. Dufort by anything other than a mutable characteristic—the maroon sweatshirt he was sporadically wearing for only a portion of the night in question. (*See* A397, 'Dufort Movie' at 1:18-1:45; 2:45-16:24.) (for the *majority* of the 'Dufort Movie,' Mr. Dufort is not wearing the maroon sweatshirt.).

Finally, the District Court appears to have ignored completely the other *five eyewitnesses* who viewed the lineup and did not identify Mr. Dufort as one of the assailants, notwithstanding the suggestive nature of the lineup. This undisputed fact should have led the District Court at least to question the veracity of Ms. Park's identification, if not to have drawn an inference in Mr. Dufort's favor, concluding that in light of the totality of the circumstances Ms. Park did not make a reliable identification and therefore no probable cause for the arrest existed.

### C. The District Court Failed to Consider and Construe Inferences Regarding Exculpatory Evidence Weighing Against Probable Cause in Mr. Dufort's Favor.

"Review for probable cause should encompass 'plainly exculpatory evidence' alongside inculpatory evidence to ensure the court has a full sense of the evidence that led the officer to believe that there was probable cause to make an arrest." *Stansbury v. Wertman*, 721 F.3d 84, 93 (2d Cir. 2013) (citing *Fabrikant v. French*, 691 F.3d 193, 214 (2d Cir.2012)); *see also Stansbury*, 721 F.3d at 93 ("A story is never a single chapter, it is the experience of the entire tale; the same is

true of probable cause."); *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) ("[A]n officer may not disregard plainly exculpatory evidence.").

The surveillance videos on the night in question clearly show another male wearing maroon who was involved in or present for the assault, and who very easily could have been incorrectly identified as Mr. Dufort when viewing the back of their clothing. After the assault, he can be seen leaving the bar through the hallway entrance on the left side of the screen holding the same club or bat. (*See* A501, 'Hallway entrance' at 150:01-150:09; *Cf.* A397, 'Dufort Movie' at 17:06-17:13 (comparable view of Mr. Dufort's clothing to other maroon-wearing male in A501, 'Hallway entrance' at 150:01-150:09).) This other maroon-wearing-male can be seen entering the room where the assault took place holding a club or bat. (*See* A501, 'Front desk of bar (2:00am-4:45am)' at 136:48-136:51.) Additionally, he can be seen leaving the front entrance of the bar after the fight, and his back *is directly in Ms. Park's line of vision* before she reenters the bar. (*See* A501, 'Front outside entrance view of karaoke bar (3:47am-4:22am)' at 2:41-2:44.)

The presence of this other maroon-wearing-male is especially exculpatory in light of Ms. Park's uncertainty about the actions of this person versus Mr. Dufort. In Ms. Park's deposition, during the discussion about the two individuals wearing maroon that were present for the fight, she was asked, "Can you describe them? Two separate individuals, right?" She responded, "Two separate individuals, but I

don't know which person I saw exactly. But one who were wearing those kind of color [sic] was [j]umping and stomping Jung Hwa Lee." (A435-36 at 95:23-96:24.) As a follow up, Ms. Park was asked what the other maroon-wearing person who was not "[j]umping and stomping Jung Hwa Lee" was doing during the assault, and she answered, "I don't know who is who. But maybe the both [sic]. I don't remember exactly." (A436-37 at 96:25-97:7.)

Even though Ms. Park expressed uncertainty regarding Mr. Dufort as compared to the other maroon-wearing-male, the District Court improperly failed to draw inferences regarding Ms. Park's identification of that other person in Mr. Dufort's favor. In support of its probable cause determination, the District Court stated that "[t]he street view camera had footage of an individual in a red button-down shirt holding a bat, leaving the bar a few seconds after Dufort had exited," (A526), and said that "[a]lthough Park further stated that she saw at least two people wearing red tops at the bar on the night of the assault, she reported that she was able to identify Dufort as the assailant because the other individual wearing a red top had very short, spiky hair, and Dufort did not," (A527.) (citing A291, ¶ 22; A330-31 ¶ 22; A171-73.) The District Court then relied on these fact-findings in its probable cause determination, writing that:

> Although Park identified Dufort by virtue of the hooded red sweatshirt he was wearing and not by recognizing his face, the parties point to only one other person who can be seen in the videos wearing a red shirt, and Park was able to distinguish him from Dufort because of the

type of shirt he was wearing and because of the other individual's short, spiky hair. These additional details enhance the reliability of Park's identification.

(A534.)

First, the District Court incorrectly construed Ms. Park's testimony as support for her ability to identify Mr. Dufort as an assailant. At most, her testimony supports only her ability to identify Mr. Dufort in the *lineup*. And, as discussed above, Ms. Park was only able to make the lineup identification because she had reviewed videotapes and still photos of Mr. Dufort at the direction of the defendant police officers prior to the lineup, and because Mr. Dufort was the only individual in the lineup wearing maroon. Specifically, Ms. Park was asked the following questions and provided the following answers:

> Q. When you saw someone with a maroon color sweatshirt *in the line up*, did you know which of the two people in the maroon clothing from the incident that was or did you just say that must be one of the two? . . .

> A. But I remember another red shirt. He was spiky hair, very short hair. That's why. I don't remember if I did the line up for him too, but I am sure that he was short spiky hair. That's all I recognize.

> Q. With regard to this person in the line up, at the time you saw the line up, is it true that you did not know his face, that you knew the clothing, the clothing color? . . .

> A. I knew his face, but not from the occur [sic] in October 2006. But the clothing, I definitely recognized, but the face, I saw him through the video.

(A451-52 at 165:24-166:24.) (emphasis added). This testimony makes clear that her remarks explained only how she recognized Mr. Dufort *at the time of the lineup*—they do not relate to her recollection of who wore maroon while participating in the fight.

Second, the fact that the other individual wearing a maroon-colored shirt had short spiky hair could not have influenced Ms. Park's identification of Mr. Dufort in the lineup because all of the lineup participants were told to wear baseball caps. (A471.) It is unclear why the detectives directed the lineup participants to wear hats, but there can be no doubt that the *only* distinguishing characteristic Ms. Park could identify in the lineup was the color of Mr. Dufort's clothes.

Third, the District Court failed to address whether Ms. Park told *anyone*— much less the arresting officers in this case—about her recognition of "short spiky hair" until she was deposed in the current action. Because a court's assessment of probable cause must be objectively assessed based upon "the facts known by the arresting officer at the time of the arrest," *Jaegly v. Couch*, 439 F.3d 149, 153 (2d Cir. 2006), the District Court's reliance on this statement in establishing probable cause was misplaced. *See also Shamir v. City of New York*, 804 F.3d 553, 557 (2d Cir. 2015) (noting that the district court erred in its probable cause determination because it relied on information obtained after his arrest, which

"cannot be used to show what the officers knew at the time of the arrest" yet nonetheless affirmed on alternate grounds).

Fourth, as set forth above, Ms. Park's deposition testimony indicates that she did not have a firm grasp of which maroon-wearing individual was the one who engaged in the assault. (A435-37 at 95:23-97:7.) In fact, Ms. Park openly admits that she did not know "who [was] who" as between the two maroon-wearing individuals and she did not "know which person [she] saw exactly." *Id.*

The District Court failed to consider the possibility that there were multiple people wearing maroon that night who could have participated in the assault. In fact, Ms. Park testified that she saw at least two people wearing maroon but did not know which of them was an assailant. *Id.*; (A330-31, ¶ 22.) Such an oversight is compounded by the fact that the videos provide only limited vantage points into Pastel Karaoke and its surrounding area, and articles of clothing (in particular, sweatshirts) are easily taken on and off. Moreover, the color quality of the video is low for many of the cameras—at times, Mr. Dufort's maroon sweatshirt appears blue or gray. (A397, 'Dufort Movie' at 2:09-2:18; 16:38-16:52; 17:18-17:25; *see also* A330-31, ¶ 22) ("The surveillance video does not definitively depict how many individuals were wearing maroon colored shirts in the karaoke bar at the time of the assault because some individuals were wearing coats, and because the camera angles and color shading did not definitively capture each individual's shirt

color."). Despite that, upon careful review, the clearest video in terms of color quality show at least three other individuals present at Pastel Karaoke wearing maroon, one of whom is even wearing a maroon sweatshirt with writing on the front similar to the sweatshirt Mr. Dufort wore that night. (*See* A501, 'Hallway entrance' at 23:25-23:31, 24:13-24:23; 43:26-43:37; 126:42-126:48.) The District Court should have drawn an inference regarding the presence of these individuals—and resolved the ambiguities in Ms. Park's confused testimony—in Mr. Dufort's favor, not against him.

### D. The District Court Misapplied the Law in Conflating Presence at the Scene with Likelihood of Involvement.

In support of its probable cause analysis, the District Court cited as a relevant circumstance the fact that Mr. Dufort "does not deny that he is seen in the surveillance video . . . and that alone conclusively establishes that he was present at the time and place" of the assault. (A533.) But mere presence at a karaoke bar with several dozen other people is not sufficient to give rise to probable cause for arrest and subsequent murder charges.[9] *See, e.g.*, *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) ("[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause . . . . [A]

---

[9] Moreover, the simple fact of Mr. Dufort carrying a metal pipe also does not constitute probable cause, because *nobody* in this case has alleged that Mr. Dufort used a pipe during the attack. Ms. Park says she saw the person in maroon "stomping". (A436-37 at 96:17-97:7.) Sebastian Yoon said with respect to Mr. Dufort he "th[ought] he punched." (A420.)

search or seizure of a person must be supported by probable cause *particularized* with respect to that person.") (emphasis added).

Defendants also argued below that the testimony of a co-defendant turned cooperator, Mr. Putt, "would have been sufficient, when viewed in conjunction with the surveillance video, to indict Dufort." (A72.) Mr. Putt testified to the grand jury about his own participation in the fight, and additionally testified that Mr. Dufort was present during a conversation in which Mr. Putt and another co-defendant, John Bae, discussed the pipe Bae had used in the fight. (A295-96, ¶ 43(e).) Notably, however, Mr. Putt did not testify that Mr. Dufort participated in the fight, and in fact testified at trial that he did not know where Mr. Dufort was during the fight. (A333, ¶ 43(e); A413 at 1580:3-6.) Although Mr. Dufort's presence at the bar and his association with others who were participants in the assault are not facts in dispute, they are not determinative to the question of whether he participated in the assault. The inference behind Mr. Putt's failure to identify Mr. Dufort as a participant in the assault, particularly in light of the fact that he was cooperating with the prosecution and had every reason to implicate Mr. Dufort, should have been—but was not—construed in Mr. Dufort's favor.

## II. The District Court Did Not Give Sufficient Weight to Material Factual Disputes Regarding the Improper Police Procedures in this Case that Tainted the Grand Jury and Subsequent Proceedings.

The District Court failed to give sufficient weight to the facts and construe inferences in Mr. Dufort's favor regarding the defendants' malicious prosecution of Mr. Dufort and their fabrication of evidence against him.

### A. A Triable Issue of Fact Exists Regarding Whether the Chain of Causation between the Officers' Conduct and the Subsequent Prosecution was Broken.

The defendant-officers in this case cannot avoid liability on the ground that the ADA's decision to prosecute Mr. Dufort was a superseding cause of the constitutional violations against him. "[T]he chain of causation between a police officer's unlawful arrest and a subsequent conviction and incarceration is broken by the intervening exercise of independent judgment," *except* when there is evidence that "the police officer misled or pressured the official who could be expected to exercise independent judgment." *Townes v. City of New York*, 176 F.3d 138, 147 (2d Cir. 1999). The District Court erred in holding that because "plaintiff is unable to point to any evidence indicating that the defendant officers misled the prosecutors responsible for Dufort's case," the prosecutors' independent exercise of judgment precluded plaintiff from bringing his constitutional claims against the defendant-officers. (A537.) "[F]oreseeability and causation . . . are

issues generally and more suitably entrusted to fact finder adjudication." *Higazy v. Templeton*, 505 F.3d 161, 175 (2d Cir. 2007) (internal quotation marks omitted).

1.  A material factual dispute exists regarding whether the ADA and the state court knew of the limited scope of Ms. Park's identification.

Viewed in the light most favorable to Mr. Dufort, the facts demonstrate "that the issues of causation depend on the resolution of issues of fact that cannot be decided as a matter of law." *Higazy*, 505 F.3d at 175. Contrary to the District Court's assertion that "the undisputed evidence is that the assistant district attorneys responsible for Dufort's prosecution were told by Park herself that she could recognize Dufort's clothes but not his face," a material factual dispute exists regarding whether the ADAs in this case were ever told of the nature of Ms. Park's identification and when they were told of such an identification. (A537; A469, ¶ 11; A177-78 at 176:3-177:23; A167-68 at 155:17-156:11; A169 at 157:2-16.) The District Court erred in failing to leave these factual disputes for determination by a jury. *See Gallo*, 22 F.3d at 1224 (a trial court's duty "is confined . . . to issue-finding; it does not extend to issue-resolution").

Specifically, the District Court found—despite an affidavit from Mr. Dufort's former counsel, Walter Mackey, stating the contrary—that Ms. Park had told detectives *and* an ADA during Mr. Dufort's lineup that she recognized him only from the color of the shirt, and not from his face. (A528; A469, ¶ 11.)

The District Court also found that Ms. Park had told an ADA when preparing for trial that she recognized Mr. Dufort only by his clothing, not his face. (A528.)

But Ms. Park's testimony as to whom she told what at the time of the lineup is muddled and contradicted by the testimony of defense counsel in this case. (*Compare* A456-57 at 170:19-171:10 (stating that she did not know who in particular at the lineup that she told she could only recognize Mr. Dufort from his clothes and not his face, albeit noting that an ADA was present at the lineup) *with* A457 at 174:5-21 (when asked what she informed the individuals involved in the lineup, she testified that she could not remember what she said) *and* A469, ¶ 11 ("Ms. Park did not state, at any time before, during, or after she selected Dufort in the lineup, that her selection of Dufort was only based on the color of the shirt that she had seen an assailant wearing during the assault, and not on any facial or physical characteristics of the assailant.").)[10]

---

[10] The District Court attempted to write away this statement by suggesting that defense counsel was simply not present or did not hear Ms. Park when she made statements at the lineup. (A538.) But a full review of Ms. Park's transcripts, as set forth above, demonstrate that Ms. Park's testimony on this issue is confused, and it is much more likely that she did not make any statement regarding the nature of her identification of Mr. Dufort at the time of the lineup, as defense counsel testified. At any rate, the District Court did not resolve these ambiguities in Mr. Dufort's favor, as it must. The inference that Ms. Park may have had discussions with the ADAs in the absence of her defense counsel when defense counsel was present with her at the precinct is certainly an inference drawn against Mr. Dufort's favor. (*See* A538 ("It does not appear from the excerpts of Park's testimony submitted by the parties that Park was ever asked whether Mackey, or anyone representing Dufort, was present when she spoke 'about the red clothing.' Accordingly, the fact that Mackey did not hear Park report that she could not recognize Dufort's face does not contradict Park's testimony that she acknowledged that fact to an assistant district attorney.").)

Her testimony is similarly unclear—and at times contradictory—regarding what she told the ADAs prior to the grand jury indictment and prior to trial. (*Compare* A177-78 at 176:3-177:23 ("Q. The District Attorney, whether it was Vozzo or whoever was there at the beginning, is it fair to say that they knew in 2006 when you were doing this investigation that with regard to Ryan Dufort, you knew the clothing, not the face? A. Yes . . . . Q. Is it fair to say that you also told whom ever [sic] was there from the District Attorney's office meeting or interviewing you in 2006 that with regard to Ryan Dufort, you only could identify the color of his clothes and not his face? A. Yes.); A167-68 at 155:17-156:11 (when asked, she testified that she discussed with ADA O'Connor in advance of trial her concern that she could only identify Mr. Dufort's clothing and not his face); A169 at 157:2-16 (testifying that she *could not remember* what she told ADA O'Connor about the individuals for whom she could only point out clothing and not faces; and that she *could not remember* whether she told him she was worried because she did not know who the witnesses were by face).)

In short, Ms. Park's testimony—given years later in a deposition for the instant matter—is unclear and imprecise regarding both the substance and the timing of her statements. Accordingly, "[t]here is not enough evidence in the record about what communications occurred between [Park] and the prosecutor . . . to allow [the court] to decide, as a matter of law, whether there were superseding

causes cutting off [defendant's] liability." *Higazy*, 505 F.3d at 178 (finding that, in a claim for deprivation of the Fifth Amendment right against compulsory self-incrimination, the jury must decide whether the officer deceived a subsequent decision maker or could "reasonably foresee that his misconduct [would] contribute to an 'independent' decision that results in a deprivation of liberty" (quoting *Zahrey*, 221 F.3d at 352)). And "if the ADA was simply not informed of the alleged problems with the evidence, then he could not be a superseding cause of the deprivation of [plaintiff's rights]."[11] *Bermudez v. City of New York*, 790 F.3d 368, 375 (2d Cir. 2015) (citing *Myers v. Cty. of Orange*, 157 F.3d 66, 73-74 (2d Cir. 1998)). The District Court thus erred in finding that no material factual dispute existed on this point.

    2.    <u>In any event, a material factual dispute exists regarding whether the defendant-officers misled the state court and the ADA regarding their fabrication of Ms. Park's lineup identification.</u>

Even assuming that an ADA involved in this case knew at some point in time about the limited nature of Ms. Park's identification of Mr. Dufort in the video and still images, a triable issue of fact nonetheless exists regarding whether the defendant-officers misled the ADAs regarding the illegitimate procurement of

---

[11] The same is true of any determination by the state court in the *Wade* hearing held in the underlying criminal case on January 8, 2009. ( *See* A399-400, ¶ 13). At that hearing, defendant Marotta testified that Ms. Park selected Mr. Dufort in the lineup, *and* that she had identified him while viewing videos prior to the lineup, but made no mention of the fact that these "identifications" were of the back of a maroon sweatshirt, and not any facial or physical characteristic of Mr. Dufort's person. (A399-401, ¶¶ 13-22.)

Ms. Park's identification of Mr. Dufort in the lineup. Specifically, even if Ms. Park told an ADA at the time of the lineup (or before trial) that she could only identify Mr. Dufort by the color of his clothing, there is a material factual dispute regarding whether the ADA knew *how* Ms. Park's participation in the lineup came about. As set forth above, the defendant-officers manufactured probable cause by obtaining a lineup identification by Ms. Park despite having been told by her that she could *not* identify Mr. Dufort's face, and despite knowing that any identification of Mr. Dufort at that lineup would be tainted by her earlier review of multiple videos and still images of Mr. Dufort.

In *Bermudez*, the Second Circuit overturned the District Court's determination that the ADA in that case "could not have been misled, because he participated in the investigation." *Bermudez*, 790 F.3d at 375. The Second Circuit found that "a reasonable jury could still find that [the ADA's] decision to prosecute [the plaintiff] could have been proximately caused by the officers' conduct" because the ADA was not present at earlier steps of the investigation—a photo array viewing and the original interrogation of a witness. *Id.* This Court found that "[i]f the ADA took as true what [the defendant-officer] told him about [the witness's] early and supposedly totally voluntary identification, [the ADA] might have been led to conclude, incorrectly, that any defects in the witnesses' identifications were minor matters and for that reason could be ignored." *Id.*

*Bermudez* thus instructs that the sequence of events matters. In each stage of this case, the defendant-officers testified that Ms. Park positively identified Mr. Dufort in a lineup. (A295, ¶ 41; A297, ¶ 50; A406-08 at 46:23-48:8.) But they did not testify that they conducted this lineup *after* Ms. Park told them she could not identify Mr. Dufort by his face and *after* Ms. Park told them that she could only identify a maroon shirt. These facts were revealed only after Mr. Dufort spent almost five years in detention facilities. Accordingly, even assuming that the ADA learned of the limited nature of Ms. Park's identification of Mr. Dufort at the time of the lineup, the defendant-officers had *already inappropriately constructed* that lineup. The evidence had already been tainted.

The District Court thus erred in concluding that a jury could not find that the defendant-officers' failure to inform the prosecutor or the state court about the problems with Ms. Park's identification—apparent from the initial questioning of these witnesses—could have prevented the ADA and the state court from making an informed decision about the reliability of that evidence. A triable issue of fact exists regarding whether the defendants' conduct tainted the grand jury proceeding and the subsequent deprivation of Mr. Dufort's constitutional rights.[12]

---

[12] *Bermudez* also noted that the ADA in that case could have been misled by the witness' adoption of an unreliable identification. Specifically, the court stated that "[o]nce the witnesses had adopted a story—either because of a suggestive presentation of photographs or because of more overt coercion by the officers—they might very well have decided to stick with that story (or become convinced that it was true), and for that reason have misinformed the ADA when he subsequently questioned them." *Bermudez*, 790 F.3d

**B. The District Court Failed to Draw Inferences and Resolve Ambiguities in Mr. Dufort's Favor Regarding Whether the Defendant-Officers Had Probable Cause to Initiate a Criminal Proceeding Against Mr. Dufort.**

To establish a claim for malicious prosecution, a plaintiff must show lack of probable cause for commencing a criminal proceeding, as well as actual malice in doing so. "[L]ack of probable cause generally raises an inference of malice sufficient to withstand summary judgment." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 131 (2d Cir. 1997) (citation omitted). The District Court erred in finding that Mr. Dufort's malicious prosecution claims failed because there was probable cause to commence the proceedings against him and because there was no evidence that the defendant-officers misrepresented or falsified evidence or engaged in bad faith sufficient to overcome the presumption of probable cause that arose when Mr. Dufort was indicted by a grand jury.

First, as set forth above, there was not probable cause to arrest Mr. Dufort. Accordingly, there was not probable cause to justify his continued confinement and prosecution. Indeed, the only piece of evidence that supplemented the state's

_____

at 375-76 (citing, *e.g.*, Maria S. Zaragoza, Robert F. Belli, & Kristie E. Payment, *Misinformation Effects and the Suggestibility of Eyewitness Memory*, in DO JUSTICE AND LET THE SKY FALL: ELIZABETH F. LOTUS AND HER CONTRIBUTIONS TO SCIENCE, LAW, AND ACADEMIC FREEDOM (Garry & Hayne eds., 2006) (noting empirical studies that show a suggestive forensic interview practices create a "misinformation effect"). Indeed, Ms. Park herself was susceptible to this effect. She stated that—by the time the lineup was held—the reason she "was able to pick Ryan Dufort through the line up is because [sic] I saw, *I reviewed the videos, of course,* and also by I remember the color of his clothing." (A451 at 165:2-13.)

case by purporting to directly implicate Mr. Dufort in the assault—namely, Yoon's statement at his guilty plea that he "thought" Mr. Dufort punched the victim— came *fourteen months* into Mr. Dufort's wrongful confinement. Moreover, his statement was made after the ADA in that case had said "no way" and "if you do not answer my questions the People are going to oppose this plea" in response to Yoon's testimony that he could not remember certain of the events on the night in question, and after the state court had admonished Yoon that he "might think [he was] acting macho but [he] won't be feeling that way if [he] g[ot] 25 years to life on this case." (A248 at 9:21-23.) Strikingly, in response to Mr. Yoon's statement that he could not remember another co-defendant's actions on the night in question, the court sarcastically told Mr. Yoon "bye bye," and elaborated that Yoon was going to trial and would face 50 years to life. (A416 at 11:18-20.) Mr. Yoon's own counsel added that "all of the other people have already confessed against you." (A249 at 10:1-2.) Only after these intimidating statements by the prosecutor, the state court, and his own counsel Yoon said that, regarding Mr. Dufort's involvement: "I think he punched." (A250 at 15:25.) Yoon's statement can hardly be construed as probable cause to continue to confine Mr. Dufort for an additional *four years*. At the very least, the District Court erred in failing to construe inferences behind Yoon's comment—and the context in which it was made—in Mr. Dufort's favor.

Second, the presumption of probable cause that attaches after a grand jury indictment "may *only* be rebutted by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Savino*, 331 F.3d at 72 (citation omitted) (emphasis in original). The circumstances in this case demonstrate that the grand jury proceeding was tainted. As described above, the defendant-officers manufactured Ms. Park's lineup identification of Mr. Dufort, and this identification was the *sole* piece of evidence presented to the grand jury that directly implicated Mr. Dufort in the assault.

Moreover, and as set forth above, the fact that these officers had Ms. Park participate in a lineup of Mr. Dufort at all, after she had told them that she could not identify his face, itself tainted the grand jury proceedings by leading to the admission of a fabricated piece of evidence: the lineup. Finally, defendants facilitated this cover-up by failing to record Ms. Park's statements in DD5s, a highly unusual and inappropriate omission in police procedure.

**C.    The District Court Did Not Give Sufficient Weight to Material Factual Disputes Regarding the Improper Police Procedures in this Case that Gave Rise to Claims for Deprivation of the Right to a Fair Trial and to Substantive Due Process.**

The District Court erred in dismissing Mr. Dufort's claims for deprivation of his right to a fair trial and to substantive due process on the grounds that these claims were "premised on the same unsupported allegation that the defendant

officers concealed the limited nature of Park's ability to recognize Dufort."

(A540.)

> 1. <u>Material factual disputes exist regarding the claim for deprivation of the right to a fair trial.</u>

"A police officer denies a defendant a fair trial when she creates 'false information likely to influence a jury's decision and forwards that information to prosecutors.'" *Fappiano v. City of N.Y.*, 640 Fed. App'x 115, 118 (2d Cir. 2016) (summary order) (quoting *Ricciuti*, 124 F.3d at 130 (2d Cir. 1997). The Second Circuit defines this right as the "right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigatory capacity." *Zahrey v. Coffey*, 221 F.3d 342, 344 (2d Cir. 2000). Probable cause is not a defense to a fabrication-of-evidence claim.

The defendant-officers fabricated the lineup identification by Ms. Park—the only one of *six* witnesses to identify Mr. Dufort in the lineup—by (1) setting up the lineup despite the fact that they knew that Ms. Park could not identify Mr. Dufort's face, and could only identify the back of a maroon shirt; and (2) by allowing the lineup to proceed despite the fact that Mr. Dufort was wearing a similar or identical maroon shirt.[13]

---

[13] It is of no moment whether Ms. Park was cross-examined at *trial* on these issues, or that Mr. Dufort was ultimately acquitted. The constitutional injury that he suffered as a result of the defendant-officers' fabrication of evidence had already resulted in his "unjustified deprivation of . . . liberty before . . . trial." *Maldonado v. City of N.Y.*, No. 11-CV-3514 RA, 2014 WL 787814, at *10 (S.D.N.Y. Feb. 26, 2014) (rejecting defendants argument that

2. <u>Material factual disputes exist regarding the claim for violations of substantive due process.</u>

"Due process requires probable cause for an arrest, and when police officers acting in bad faith make an arrest without probable cause, the person arrested has suffered a deprivation of liberty without due process of law." *United States v. McDermott*, 918 F.2d 319, 325 (2d Cir. 1990). As discussed *supra* IA-IC, based, *inter alia*, on the deficient witness identification, there was not probable cause to arrest and prosecute Mr. Dufort. Viewed in the light favorable to Mr. Dufort, the fact that his prior counsel, Mackey, asserts that a detective from the 109th Precinct stated to him that the police knew Mr. Dufort was not involved in the assault, but were merely detaining him because they wanted him to be a witness, indicates bad faith. (A469, ¶ 12.) As such, Mr. Dufort's substantive due process rights were violated.

## III. The Defendant-Officers Are Not Entitled to Qualified Immunity.

Qualified immunity shields an officer from liability only when the officer's "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), or when "it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights." *Mandell v.*

---

plaintiff was not deprived of his right to a fair trial because he was ultimately acquitted) (collecting cases).

*Cty. of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003). In the probable cause context, qualified immunity is appropriate only when an officer had "arguable probable cause"—that is, when "officers of reasonable competence could disagree on whether the probable cause test was met." *Lennon v. Miller*, 66 F.3d 416, 423 (2d Cir. 1995) (quoting *Golino v. City of New Haven*, 950 F.3d 864, 870 (2d Cir. 1991)).

In this case, and as discussed at length above, the defendant-officers are not entitled to qualified immunity at the summary judgment stage because no reasonable officer could have found that probable cause existed to arrest and detain Mr. Dufort for nearly five years based on one eyewitness's identification of the back of a maroon top and the fabricated lineup that followed. Moreover, the officers' fabrication of Ms. Park's identification of Mr. Dufort in the suggestive lineup, as set forth above, violates Mr. Dufort's clearly established rights. Because an officer's belief is objectively reasonable "only if [the officer] did not, in fact, fabricate evidence," the qualified immunity analysis is "inextricably entwined on the merits." *See Maldonado*, 2014 WL 787814, at *10. Accordingly, here, the Court cannot determine the officers' qualified immunity defense as a matter of law.

## CONCLUSION

For the reasons set forth above, including the District Court's misapplication of the law in making its probable caused determination and the existence of several

material triable issues of fact, the District Court improperly granted the City's summary judgment motion. Accordingly, the judgment of the District Court should be vacated, and Mr. Dufort's claims should proceed to determination by a jury.

Dated: October 26, 2016

Respectfully Submitted,

DEBEVOISE & PLIMPTON LLP

By: /s/ Edwin G. Schallert

Edwin G. Schallert
919 Third Avenue
New York, New York 10022
Telephone: (212) 909-6000
egschallert@debevoise.com

*Attorneys for Plaintiff-Appellant*
*Ryan Dufort*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 12,480 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times Roman 14-point font.

Dated: October 26, 2016

# SPECIAL APPENDIX

## TABLE OF CONTENTS

PAGE

Memorandum and Order Granting Summary Judgment
to Defendants Appealed From, dated April 28, 2016 . . . . . . . . . . . . . .  SPA-1

Judgment, dated April 28, 2016 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SPA-18

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
RYAN DUFORT,

                Plaintiff,

                                           MEMORANDUM
                                           <u>AND ORDER</u>
        - against -                         12-CV-2283 (SMG)


CITY OF NEW YORK, JOSEPH MAROTTA,
JAE SHIM, THOMAS CONFORTI,
WILLIAM SCHMITTGALL, RICHARD A.
BROWN, PATRICK O'CONNOR, MICHAEL
VOZZO, AND JOHN DOE DEFENDANTS 1-10,

                Defendants.
--------------------------------------------------------------X
GOLD, STEVEN M., U.S.M.J.:

## INTRODUCTION

       Plaintiff Ryan Dufort brings this action pursuant to 42 U.S.C. § 1983 and state law

asserting that his rights were violated when he was arrested and prosecuted for murder,

manslaughter, and assault.  Complaint ("Compl."), Docket Entry 1.  Although he originally

asserted claims against Queens District Attorney Brown and Assistant District Attorneys

O'Connor and Vozzo, he has since withdrawn each of his claims against these defendants and

certain causes of action asserted against the other defendants who remain.[1]  Plaintiff's pending

causes of action are brought against four New York City police officers and the City of New

York, and principally assert claims for false arrest, malicious prosecution, and denial of due

process and a fair trial.

---

[1] Pl. Mem. in Opp. to Summ. J., Docket Entry 66, at 22.

Defendants now move for summary judgment.  The parties have consented to the assignment of this case to a United States Magistrate Judge for all purposes.  Docket Entry 37. For the reasons stated below, defendants' motion for summary judgment is granted in its entirety.

## FACTS

The following facts are construed in the light most favorable to Dufort, the non-moving party, and they are derived primarily from the parties' Local Rule 56.1 statements.[2]  *See* Pl. R. 56.1, Docket Entry 67; Defs. R. 56.1, Docket Entry 65.

On the evening of October 7, 2006, plaintiff Dufort went to a karaoke bar in Queens with his friends Christopher Baez, Sebastian Yoon, Jeffrey Shih, and John Bae.  Defs. R. 56.1 ¶¶ 1, 25, 35(a).  Dufort was fifteen years old at the time and enrolled at Bayside High School as a freshman.  Defs. R. 56.1 ¶ 24.  When he arrived at the bar, Dufort was wearing a hooded maroon zip-up sweatshirt with the logo "American Eagle" written in white letters across the chest.  Defs. R. 56.1 ¶ 15.

Before going to the bar, Dufort, Yoon, Baez, and Bae went to a construction site where they gathered pieces of pipe.  Defs. R. 56.1 ¶ 48.  Dufort brought a piece of pipe to the karaoke bar, concealed in his sweatshirt, because he had been told to bring something to defend himself "just in case."  Defs. R. 56.1 ¶ 27.  After arriving at the bar, Dufort and his friends joined a group of approximately twenty current and former Bayside High School students and friends of friends. Defs. R. 56.1 ¶ 26; *see* Pl. R. 56.1 ¶ 26.

At approximately 3:00 a.m. on the morning of October 8, 2006, Jung Hwa Lee, Hwa Young Park, Mink-ki Shin and In Hee Yoo went to the karaoke bar.  Defs. R. 56.1 ¶ 6.  As they

---

[2] The parties' respective submissions in support of and opposition to summary judgment are sequentially filed as docket entries 62-74.  In addition to the parties' Rule 56.1 statements, the facts recited in the text are drawn from supporting material and exhibits from the Declaration of Elizabeth Norris Krasnow ("Krasnow Decl."), Docket Entry 64; the deposition of Hwa Young Park ("Park Dep."), Docket Entry 69-11; and the declaration of William F. Mackey, Jr. ("Mackey Decl."), Docket Entry 69-14.  Unless otherwise noted, all facts drawn from the Defendants' Statement of Material Facts are undisputed.

attempted to leave around 3:50 a.m., Lee and Shin were assaulted by a group of males.  Defs. R. 56.1 ¶ 7.  Emergency Medical Services ("EMS") personnel arrived at the bar at approximately 4:06 a.m. and found Lee lying face down in a pool of blood.  Defs. R. 56.1 ¶¶ 1-2.  Lee was unconscious, unresponsive, and had no pulse.  Defs. R. 56.1 ¶ 3.  EMS personnel transported Lee to Flushing Hospital, where he was pronounced dead on arrival at 4:55 a.m.  Defs. R. 56.1 ¶ 4.  Shin was also injured, having sustained a head wound that required nine staples to close.  Defs. R. 56.1 ¶ 8.

A New York City Police Department Sergeant from the 109th Precinct responded to Flushing Hospital at approximately 5:30 a.m. and spoke to Park, who identified herself as a witness to the assault on Lee.  Defs. R. 56.1 ¶ 5.  Park then went to the 109th Precinct where she viewed surveillance video from the karaoke bar with defendant Detective Joseph Marotta, who had already watched the video multiple times.  Defs. R. 56.1 ¶¶ 9-10.  The video captured the following areas: a street view of the entrance to the building where the bar was located, the exterior corridor leading to the entrance to the bar itself, the interior corridor leading to karaoke rooms, and part of the bar area.  The portion of the karaoke bar where the assault occurred was not subject to video surveillance.  Defs. R. 56.1 ¶¶ 11-12.  Video recorded by the exterior corridor camera revealed Dufort approaching the entrance of the karaoke bar hours before the assault, gripping the pipe that was concealed under his sweatshirt, and later exiting the karaoke bar with nine or ten other individuals.  Defs. R. 56.1 ¶¶ 16, 18; Pl. R. 56.1 ¶ 18.  Video recorded by the interior corridor camera showed Dufort heading to the bar area with the pipe in one of the sleeves of his sweatshirt.  Defs. R. 56.1 ¶ 17; Pl. R. 56.1 ¶ 17.  The street view camera had footage of an individual in a red button-down shirt holding a bat, leaving the bar a few seconds after Dufort had exited.  Defs. R. 56.1 ¶ 19.

Park told Detectives Marotta and Jae Shim that, during the assault on Lee, she saw only the back of the assailant's shirt.  Pl. R. 56.1 ¶ 21.  While viewing the surveillance video and accompanying still photographs, Park stated that she recognized Dufort's shirt to be the same color as the back of the assailant's shirt, and also acknowledged that she did not recognize Dufort by any facial or physical characteristics because she did not see his face during the assault.  Pl. R. 56.1 ¶¶ 21, 36.  Park stated that she saw the person wearing the shirt she recognized stomping on Lee and Shin during the barroom assault.  Defs. R. 56.1 ¶ 14.  Although Park further stated that she saw at least two people wearing red tops at the bar on the night of the assault, she reported that she was able to identify Dufort as the assailant because the other individual wearing a red top had very short, spiky hair, and Dufort did not.  Defs. R. 56. 1 ¶ 22; *see* Pl. R. 56.1 ¶ 22; Park Dep. at 164-66.

David Han and Eric Kim were also at the bar on the night Lee was assaulted.  Han and Kim were familiar with some of the people at the bar, and provided police officers with the names of certain individuals depicted in the surveillance video, including Dufort.  Defs. R. 56.1 ¶ 28; *see* Krasnow Decl. Ex. E at 50-51.

On October 11, 2006, a few days after the assault, police detectives stopped Dufort outside of a 7-Eleven store.  Defs. R. 56.1 ¶ 29.  Dufort was handcuffed, taken to the 109th Precinct, and charged by Detective Marotta with murder in the second degree and gang assault in the first degree.  Defs. R. 56.1 ¶¶ 30-31.  Detectives Marotta and William Schmittgall interviewed Dufort in the presence of his parents, and Dufort stated the following: On the night of the assault, he went to the karaoke bar with friends and drank beer in one of the rooms.  After an unknown male entered the room a few hours later, saying there was a fight, Dufort grabbed his sweatshirt and headed towards the exit.  He saw that his friends had pipes and bats and were

hitting two Asian males.  He stepped over one of the males on the floor and walked past the assault towards the exit.  The next day he and his friends agreed not to mention to the police any names of individuals involved in the attack.  Defs. R. 56.1 ¶¶ 34-35.

On October 12, 2006, Dufort was placed in a lineup in the presence of Detective Marotta, Lieutenant Thomas Conforti,[3] Assistant District Attorney Michael Vozzo, and William F. Mackey, Jr., Dufort's attorney.  Defs. R. 56.1 ¶¶ 36, 38; Mackey Decl. ¶¶ 6-7.  Dufort sat in the third chair and wore an unzipped maroon sweatshirt that was similar or identical to the one he was seen wearing in the surveillance video.  Defs. R. 56.1 ¶ 37.  No other individual in the lineup wore a maroon shirt.  Pl. R. 56.1 ¶ 36.  Six individuals, including Park, viewed the lineup. Although five individuals did not identify Dufort as someone involved, Park selected Dufort and stated that he participated in the assault.  Mackey Decl. ¶¶ 8, 10; Defs. R. 56.1 ¶ 39.  Park testified at her deposition in this case that, at the time of the lineup, she told the detectives and the assistant district attorney who were with her that she recognized Dufort from his clothing and not from his face.  Park Dep. at 170:19–171:10, 176:3-177:22.  Park further testified that she met with an assistant district attorney to prepare for testifying at trial, and reported at that time as well her concern that she could recognize Dufort only by his clothing and not his face.  Park Dep. at 155:17-156:16.  However, Mackey states that when Park viewed the lineup, she did not say in front of him that her selection was based only on the clothing the assailant was wearing during the assault.  Mackey Decl. ¶ 11.  Mackey further asserts that a detective from the 109th Precinct stated to him that the police knew Dufort was not involved in the assault, but wanted him to be a witness.  Mackey Decl. ¶ 11.  Based on the identifications made by Park and other

---

[3] The record is unclear as to whether Conforti is a Lieutenant or Captain.  *Compare* Krasnow Decl. ¶ 1, *with* Defs. R. 56.1 ¶ 38.

witnesses, Dufort and nine individuals were charged with murdering Lee and assaulting Shin. Defs. R. 56.1 ¶ 40.

On January 30, January 31, and February 1, 2007, Assistant District Attorneys Michael Vozzo and Andrea Eckhardt presented evidence against Dufort and six others to a grand jury. Defs. R. 56.1 ¶ 41. Jonathan Putt appeared before the grand jury pursuant to a cooperation and plea agreement and testified to the following: On the night of the assault, he was in a private room at the karaoke bar with Dufort and others when Yoon entered and announced a fight had broken out. Yoon then grabbed a bag full of weapons and headed towards the fight, with Dufort, Putt, and others following. Individuals from the group used pipes to strike Lee and Shin, and Putt punched and tried to kick them. Lee and Shin were already on the ground when Putt left the karaoke bar with Dufort, Bae, and Michael Ii. Putt told the grand jury that he saw Dufort with a pipe, but testified at trial that he did not know where Dufort was during the assault. Defs. R. 56.1 ¶¶ 43(a)-(g); *see* Pl. R. 56.1 ¶ 43(e). Park also appeared before the grand jury, and testified that men pushed Lee and Shin to the ground, stomped on their bodies, and hit them with weapons including bottles and a bat. She also testified that during the assault at least one man was holding a pipe. Defs. R. 56.1 ¶ 44(b)-(d). No one specifically alleged that Dufort used a pipe during the assault. Pl. R. 56.1 ¶ 43(h).

On February 23, 2007, the grand jury indicted Dufort and the six others on charges including second degree murder, first degree manslaughter, and gang assault. Defs. R. 56.1 ¶ 45; Indictment, Docket Entry 64-15. Yoon pled guilty to manslaughter on November 28, 2007 and implicated five assailants during his plea allocution. Defs. R. 56.1 ¶ 46; Pl. R. 56.1 ¶ 47. With respect to Dufort, Yoon stated, "I think he punched." Pl. R. 56.1 ¶ 47; Yoon Plea Tr. at 15, Docket Entry 64-16.

The charges against Dufort, Baez, Bae, Aram Choi, and Il Park proceeded to trial in May of 2011. Defs. R. 56.1 ¶ 53. Park testified, albeit reluctantly, at the trial. Defs. R. 56.1 ¶ 54. The trial court ruled that the prosecution could attempt to elicit in-court identifications from Park, but only if it did so before showing her the surveillance video. Defs. R. 56.1 ¶ 56. After Park stated she could not identify Dufort in the courtroom, the prosecution played portions of the surveillance video, froze frames portraying each defendant, and asked Park whether she recognized the particular defendant pictured as someone who participated in the assault. Defs. R. 56.1 ¶ 58. When shown a freeze-frame of Dufort taken from the surveillance video, Park testified that she recognized him by his clothing but not his face, and described his behavior as "stomping on the victim." Defs. R. 56.1 ¶¶ 59-61. When Dufort's attorney cross-examined Park, she stated that she recognized some individuals by their faces and some, such as Dufort, by their clothing. Pl. R. 56.1 ¶ 69. The jury returned a verdict on June 5, 2011 and convicted all defendants except Dufort, who was acquitted. Defs. R. 56.1 ¶¶ 65-66.

## DISCUSSION

### A. Summary Judgment

Summary judgment is properly granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Citizens Bank of Clearwater v. Hunt*, 927 F.2d 707, 710 (2d Cir. 1991). "The court 'is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of

that party, and to eschew credibility assessments.'" *Perlman v. Fid. Brokerage Servs. LLC*, 932 F.Supp.2d 397, 406 (E.D.N.Y. 2013) (quoting *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir. 2004)). The moving party bears the initial burden of establishing that there are no genuine issues of material fact; if the movant meets that burden, the non-moving party must produce evidence of specific facts that raise a genuine issue for trial to avoid summary judgment. *Anderson*, 477 U.S. at 256; *Samuels v. Mockry*, 77 F.3d 34, 36 (2d Cir. 1996). Mere conclusory allegations are insufficient; "[t]here must be more than a 'scintilla of evidence'" to defeat a summary judgment motion. *Del. & Hudson Ry. Co. v. Consol. Rail Corp*., 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252).

**B. Plaintiff's Claim of Discrimination Pursuant to Section 1981**

Plaintiff's first cause of action is brought pursuant to 42 U.S.C. § 1981. Compl. ¶¶ 42-48. To prevail on a claim under Section 1981, a plaintiff must establish (1) that he "is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) that the discrimination concerned one or more of the activities enumerated in the statute." *Bentley, Jr. v. Mobil Gas Station*, 599 F. App'x 395, 396 (2d Cir. 2015) (quoting *Mian v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 7 F.3d 1085, 1087 (2d Cir.1993)).

Defendants clearly argued for summary judgment on plaintiff's Section 1981 claim in their memorandum of law. Defs. Mem. at 13-14, Docket Entry 63. Plaintiff did not list his Section 1981 claim as among those he seeks to withdraw in his opposition memorandum. Pl. Mem. in Opp. to Summ. J. at 22-23. Plaintiff failed, however, to argue against summary judgment on this claim in his memorandum, or to point to any evidence in the record suggesting his arrest or prosecution was motivated by racial discrimination. Accordingly, defendants' motion for summary judgment on plaintiff's first cause of action is granted.

**C. Plaintiff's Section 1983 Claim for False Arrest and Unlawful Imprisonment**

Plaintiff brings various federal constitutional claims pursuant to 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan,* 443 U.S. 137, 145 n.3 (1979). To prevail on a claim under Section 1983, a plaintiff must prove that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999) (citation omitted).

Dufort first claims that he was falsely arrested and unlawfully imprisoned without probable cause. Compl. ¶¶ 50-51. To prevail on a false arrest claim, a plaintiff must show that "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir. 2003) (internal quotation marks and citation omitted); *see Jaegly v. Couch*, 439 F.3d 149, 151-52 (2d Cir. 2006) (noting that Section 1983 false arrest claims are governed by the law of the state in which the arrest occurred). There is no dispute in this case as to the first three elements; the only issue is whether Dufort's confinement was privileged.

An arrest is "privileged" when it is supported by probable cause. *Savino*, 331 F.3d at 76. Thus, a finding of probable cause is a complete defense to a false arrest claim. *Jaegly*, 439 F.3d at 152; *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994). Probable cause exists when an officer has "'knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be

arrested.'" *Savino*, 331 F.3d at 76 (quoting *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000)). "The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers . . . ." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). Generally, incriminating information obtained from a victim or eyewitnesses is sufficient to establish probable cause, particularly when there are no facts that raise doubts about the person's veracity. *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014) (citing *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)); *Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001).

Dufort's arrest was supported by probable cause because an eyewitness, Park, identified him, by his clothing, as someone she saw stomping on victims Lee and Shin. There are no facts that raise serious doubts about Park's veracity. After the assault, police officers collected video recorded by surveillance cameras. Park reviewed the video and stated that she recognized Dufort by his red sweatshirt as someone involved in the assault. There is no indication that the police suspected Dufort at that point or in any way influenced Park's identification of him. Nor is there any evidence to suggest that Park knew Dufort before the night of the assault or had any reason to accuse him falsely.

Defendants have submitted the surveillance video and I have examined it. The surveillance footage is clear and the individuals depicted in it are plainly recognizable. The color of the clothing worn by the individuals depicted may be easily seen, at least in those areas covered by the surveillance cameras that are well-lit. Dufort does not deny that he is seen in the surveillance video, Pl. R. 56.1 ¶ 16, and that alone conclusively establishes that he was present at the time and place where Lee and Shin were assaulted. Nor does Dufort dispute that he can be seen in the video with a pipe hidden in the sleeve of his sweatshirt. Pl. R. 56.1 ¶¶ 16-17.

Although Park identified Dufort by virtue of the hooded red sweatshirt he was wearing and not by recognizing his face, the parties point to only one other person who can be seen in the videos wearing a red shirt, and Park was able to distinguish him from Dufort because of the type of shirt he was wearing and because of the other individual's short, spiky hair.  These additional details enhance the reliability of Park's identification.  Probable cause does not require that a witness or victim recognize a perpetrator's facial characteristics; at least one court has held that an identification was sufficient to establish probable cause even though it was made by a victim who reported that he could not see the perpetrator's face because it was covered by a hood. *Brunson v. City of New York*, No. 07-cv-2308(CBA), slip op. at 2, 13 (E.D.N.Y. Jan. 26, 2011).

Dufort challenges Park's lineup identification of him on the ground that he was wearing the same sweatshirt for the lineup that he wore on the night of the assault.  Pl. Mem. in Opp. to Summ. J. at 4.  Whether the lineup was suggestive or not, however, is of little moment, because Park had already identified Dufort from the surveillance video before selecting him from the participants in the lineup.

Taking all of the relevant circumstances into account, I conclude that Park's identification of Dufort, even if based upon recognizing his sweatshirt and not his face, provided the defendant officers with ample probable cause to arrest Dufort.  Defendants' motion for summary judgment dismissing Dufort's false arrest claim is therefore granted.

**D.  Plaintiff's Section 1983 and State Law Claims for Malicious Prosecution**

Dufort asserts claims under 42 U.S.C. § 1983 and New York State common law for malicious prosecution.  The gravamen of these claims is Dufort's contention that the police officer defendants "misrepresented and falsified evidence," "did not make a complete and full statement of facts to the Court," and "withheld exculpatory evidence."  Compl.  ¶¶ 60-62.

Dufort also maintains that defendants lacked probable cause and acted with malice in initiating and continuing criminal proceedings against him.  Compl. ¶¶ 64-65, 67-68, 109-10.

The elements required to establish a claim of malicious prosecution pursuant to Section 1983 are "substantially the same" as those under New York law.  *Boyd v. City of New York*, 336 F.3d 72, 75 (2d Cir. 2003) (internal quotation marks and citation omitted).  To prevail on a malicious prosecution claim under 42 U.S.C. § 1983, a plaintiff must show that his rights were violated under the Fourth Amendment and establish the elements of a state law claim, which are: "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions."  *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) (internal quotation marks and citations omitted).

Plaintiff's malicious prosecution claims fail because, among other reasons, there was probable cause to commence the proceedings against Dufort and because there is no evidence that the officer defendants misrepresented or falsified evidence.  As discussed above, there was probable cause for Dufort's arrest because Park identified him, after reviewing video surveillance recordings and based upon his clothing, as someone who stomped on Lee and Shin. Generally, probable cause at the time of arrest is sufficient to defeat a claim of malicious prosecution; "if probable cause existed at the time of the arrest and the plaintiff offers no additional facts to show that it dissipated post-arrest, then the claim for malicious prosecution cannot be maintained."  *Jimenez v. City of New York*, 2016 WL 1092617, at *4 (E.D.N.Y. Mar. 21, 2016); *see Betts*, 751 F.3d at 82 (noting that "continuing probable cause is a complete defense to a constitutional claim of malicious prosecution"); *Carson v. Lewis*, 35 F.Supp.2d 250, 263 (E.D.N.Y. 1999).

The undisputed facts of this case demonstrate that the evidence against Dufort grew stronger, not weaker, as the police conducted their post-arrest investigation. Dufort was arrested a few days after the assault and acknowledged being at the karaoke bar when it occurred. He further acknowledged that there were people striking the victims with pipes and bats, and that these people were his friends. Finally, while he did not admit participating in the assault of Lee and Shin, Dufort admitted he stepped over one of them and walked past him to reach the exit of the bar.

Two participants in the assault provided additional evidence concerning Dufort. Jonathan Putt testified that he was with Dufort in a private room at the karaoke bar when Yoon entered and announced a fight had broken out. Yoon then grabbed a bag full of weapons and headed towards the fight, and Dufort was among those who followed him. Defs. R. 56.1 ¶¶ 42-43(a)-(c). Yoon later pled guilty and, during his allocution, stated that he thought Dufort was among the assailants who punched the victims. Defs. R. 56.1 ¶ 49. On October 11, 2006, just a few hours after Dufort was arrested, one of Dufort's friends, Tom Yoon ("Tom"), made statements to police officers. Tom told the officers that, approximately three weeks prior to the assault, Dufort tried to persuade Tom to join a gang known as "GS" by saying, among other things, "People don't fuck with you when you are in GS." Defs. R. 56.1 ¶¶ 32-33.

Moreover, a rebuttable presumption of probable cause arose when Dufort was indicted for the very same criminal activity for which he was arrested. An indictment by a grand jury gives rise to a presumption of probable cause that may be rebutted only with evidence that the indictment was procured by fraud, perjury, suppression of evidence, or other bad faith conduct by the police. *Stansbury v. Wertman*, 721 F.3d 84, 95 (2d Cir. 2013) (quoting *Manganiello*, 612 F.3d at 162). Dufort contends that the defendant police officers engaged in bad faith because

they did not inform the prosecutors handling Dufort's case that Park recognized Dufort only by

his clothing and not his face.  Pl.'s Mem in Opp. to Summ. J. at 5.  The undisputed evidence,

however, undermines this contention.  When she was deposed in this action, Park was asked,

apparently by Dufort's counsel, whether "it [is] fair to say that you also told whomever was there

from the District Attorney's office meeting or interviewing you in 2006 that with regard to Ryan

Dufort, you only could identify the color of his clothes and not his face," and Park responded,

"yes."  Park Dep. at 177.

Even when a plaintiff's rights have been violated by a law enforcement officer, "the

chain of causation" between the officer's unlawful conduct and a subsequent prosecution "is

broken by the intervening exercise of independent judgment" by the prosecutor, at least absent

evidence that the officer misled the prosecutor.  *Townes v. City of New York*, 176 F.3d 138, 147

(2d Cir. 1999).  Here, plaintiff is unable to point to any evidence indicating that the defendant

officers misled the prosecutors responsible for Dufort's case.  To the contrary, the undisputed

evidence is that the assistant district attorneys responsible for Dufort's prosecution were told by

Park herself that she could recognize Dufort's clothes but not his face.  The decision to prosecute

Dufort was made by prosecutors after learning that information, and thus precludes any claim

against the defendant police officers based upon the limited nature of Park's ability to recognize

Dufort.

Dufort has submitted an affidavit from an attorney who defended him in his criminal

case, William F. Mackey, Jr., in support of his opposition to defendants' motion.  Mackey Decl.

Mackey states in his affidavit that he was present on October 12, 2006, representing Dufort,

when Park identified Dufort in a lineup.  According to Mackey, Park did not at that time reveal

that she was able to identify Dufort only because she recognized his clothing and could not

recognize his face.  Although plaintiff suggests that Mackey's affidavit raises a question of fact, Pl. R. 56.1 ¶ 39, it does not.  Park's attorney in this action specifically asked Park at her deposition what she "told *the police and the District Attorney* about the red clothing."  Park Dep. at 177 (emphasis added).  It does not appear from the excerpts of Park's testimony submitted by the parties that Park was ever asked whether Mackey, or anyone representing Dufort, was present when she spoke "about the red clothing."  Accordingly, the fact that Mackey did not hear Park report that she could not recognize Dufort's face does not contradict Park's testimony that she acknowledged that fact to an assistant district attorney.  It follows, then, that plaintiff has failed to raise a material question of fact with respect to whether the defendant police officers withheld any material information from the District Attorney's Office.

Plaintiff also suggests in his opposition to summary judgment that he seeks to depose the assistant district attorneys responsible for his prosecution.  Pl. R. 56.1 ¶ 55.  Although he nowhere clearly says so, plaintiff presumably seeks this discovery to learn whether the prosecutor will confirm or refute Park's testimony, and to argue that summary judgment should be denied because the testimony of the prosecutors may raise a dispute of fact about whether Park indeed revealed that she could not recognize Dufort's face.  Plaintiff's stated intention to depose his prosecutors, though, is not a basis for denying defendants' summary judgment motion.  First, plaintiff's argument is based on mere speculation about what the prosecutors might say.  Second, plaintiff had ample opportunity to conduct the discovery he now seeks before opposing defendants' summary judgment motion.  During a conference held on July 29, 2014, I set a briefing schedule calling for defendants to serve their motion by August 8, 2014, but not requiring plaintiff to submit his opposition until October 10, 2014, and inviting plaintiff to identify any discovery he required before submitting his opposition to defendants' motion.

Docket Entry 54.  I later extended plaintiff's time to file his opposition first to December 5, 2014, then to January 19, 2015, and finally to February 3, 2015.  Docket Entry 57; Order dated December 1, 2014, granting application filed as Docket Entry 58; Order dated January 15, 2015, granting application filed as Docket Entry 59.  Nevertheless, even after receiving defendants' motion papers, plaintiff never identified or moved to compel any discovery he required before submitting his opposition.

Finally, to the extent plaintiff asserts a violation of his right to disclosure of exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), this claim also fails.  Where, as here, plaintiff's criminal trial resulted in a verdict of acquittal, the verdict "'negates any violation of his *Brady* rights and extinguishes any Section 1983 due process claim that might arise from [defendants'] alleged suppression of exculpatory evidence.'"  *Brunson*, slip op. at 22 (quoting *Ambrose v. City of New York*, 623 F.Supp.2d 454, 471 (S.D.N.Y. 2009)).  Moreover, there was no violation of plaintiff's rights under *Brady* in this case.  *Brady* requires only that exculpatory material be disclosed "in time for its effective use at trial."  *United States v. Coppa*, 267 F.3d 132, 142 (2d. Cir. 2001).  Park testified at Dufort's criminal trial and was shown Dufort's image in the surveillance video from the karaoke bar.  Park was asked by the prosecutor on direct examination whether she recognized Dufort's face.  Park responded, "not face but the clothing." Pl. Ex. J, Docket Entry 69-10, at 816:6-817:1.  The attorneys representing Dufort at his criminal trial thus had ample opportunity to cross-examine Park about her inability to recognize Dufort's face.  Accordingly, no *Brady* violation occurred.

**E.  Plaintiff's Remaining Claims**

Plaintiff, in addition to the claims described above, contends that he was deprived of his right to a fair trial and to substantive due process.  Pl. Mem. in Opp. to Summ. J. at 17-21.  These

claims are premised on the same unsupported allegation that the defendant officers concealed the

limited nature of Park's ability to recognize Dufort.  Accordingly, defendants are entitled to

summary judgment on these claims for the same reasons discussed above.

## CONCLUSION

For all the reasons stated above, defendants' motion for summary judgment is granted in

its entirety.  The Clerk of Court is respectfully directed to enter judgment accordingly and close

the case.

SO ORDERED.

_____
        /s/
STEVEN M. GOLD
United States Magistrate Judge

Brooklyn, New York
April 28, 2016

U:\smg current docs\dufort sj final.docx

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
RYAN  DUFORT,                                                          JUDGMENT
                                                                      12-CV- 2283 (SMG)
                          Plaintiff,

        -against-

CITY OF NEW YORK, JOSEPH MAROTTA,
JAE SHIM, THOMAS CONFORTI,
WILLIAM SCHMITTGALL, RICHARD A.
BROWN, PATRICK O'CONNOR, MICHAEL
VOZZO, AND JOHN DOE DEFENDANTS 1-10,

                          Defendants.
---------------------------------------------------------X

        A Memorandum and Order of Honorable Steven M. Gold, United States

Magistrate Judge, having been filed on April 28, 2016, granting Defendants' motion for summary

judgment in its entirety; and directing the Clerk of Court to enter judgment accordingly; it is

                ORDERED and ADJUDGED that judgment is hereby entered granting

Defendants' motion for summary judgment in its entirety.

Dated: Brooklyn, New York                           Douglas C. Palmer
        April 28, 2016                               Clerk of Court

                                           by:     */s/ Janet Hamilton*
                                                    Deputy Clerk